[Cite as *In re Adoption of B.G.F.*, 2018-Ohio-5063.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:

THE ADOPTION OF:

    B.G.F.

[T.H.P. - APPELLANT]

CASE NO. 17-18-06

**O P I N I O N**

Appeal from Shelby County Common Pleas Court
Probate Division
Trial Court No. 2017 ADP 00025

**Judgment Affirmed**

Date of Decision: December 17, 2018

APPEARANCES:

    *Justin M. Lopez* **for Appellant**

    *Steven J. Geise* **for Appellee, C.M.F.**

**SHAW, J.**

{¶1} Respondent-Appellant, T.H.P. ("Father") appeals the May 17, 2018 judgment of the Shelby County Court of Common Pleas, Probate Division, finding Petitioner-Appellee, C.M.F., ("Step-Father") proved by clear and convincing evidence that Father failed to have more than *de minimis* contact with his biological child, B.G.F., and that Father failed to provide maintenance and support of B.G.F. as required by law or judicial decree for a period of at least one year immediately preceding the filing of the adoption petition filed by Step-Father. As a result, the trial court concluded that Father's consent to Step-Father's Petition for Adoption of B.G.F. is not required, and ordered the case to proceed on the adoption petition. On appeal, Father argues that he was not properly served with notice of the adoption; that the trial court erred in failing to apply the consent requirements of R.C. 3107.07(B); and that the trial court's decision is against the manifest weight of the evidence.

{¶2} B.G.F. was born in 2014 in Indiana, to M.F. ("Mother") and Father, who were living together, but were not married. Shortly thereafter, Mother left Father and moved to Ohio. In December of 2014, Mother and Step-Father began living together and continued to reside in Ohio. Mother and Step-Father eventually married in 2017.

{¶3} On October 19, 2017, Step-Father filed a Petition for Adoption of B.G.F. alleging that Father's consent to the adoption petition is not required because (1) Father failed without justifiable cause to provide more than *de minimis* contact with B.G.F. for a year immediately preceding the filing of the adoption petition; and (2) Father failed without justifiable cause to provide for the maintenance and support of B.G.F. as required by law for a period of at least one year immediately preceding the filing of the adoption petition. *See* R.C. 3107.07(A). Notice of a hearing on the adoption petition was sent to Father and he filed an answer denying Step-Father's allegations pertaining to his claim that Father's consent is not required based upon the grounds set forth in R.C. 3107.07(A). Father subsequently filed objections to the Petition for Adoption. The trial court set a hearing on the matter.

{¶4} On March 19, 2018, the trial court conducted a hearing on whether Father's consent to the Petition for Adoption is not required under R.C. 3107.07(A). Step-Father presented his own testimony in addition to that of Mother, Mother's parents, and an acquaintance who knew both Father and Mother when they lived together in Indiana. Father and Father's mother both testified in support of Father's opposition to the adoption petition.

{¶5} The parties filed post-hearing briefs. In his brief, Father for the first time argued that Step-Father had elected in his adoption petition to proceed under the wrong statutory provision. In particular, Father maintained that Step-Father

erroneously alleged Father is B.G.F.'s *natural parent* under R.C. 3107.07(A) in the adoption petition. Father claimed that under Ohio Adoption Law he is considered a *putative father* under R.C. 3107.07(B), which provides a different criteria for proving that Father's consent is not required to the adoption petition. Father asserted that he was not properly served notice of the adoption petition, and argued that the trial court should have conducted the evidentiary hearing applying the standards set forth in R.C. 3107.07(B). Father further argued that, in any event, Step-Father failed to demonstrate by clear and convincing evidence that the adoption petition could proceed without Father's consent under either R.C. 3107.07(A) or R.C. 3107.07(B).

{¶6} On May 18, 2018, the trial court issued a judgment entry finding that Father's consent to the adoption petition is not required. Specifically, the trial court found that Father is not a putative father, but the natural parent of B.G.F., and consequently, R.C. 3107.07(A) applied. The trial court further found that Step-Father proved by clear and convincing evidence that Father failed to have more than *de minimis* contact with B.G.F. and failed to provide maintenance and support to B.G.F. in the year immediately preceding the filing of the adoption petition. Accordingly, the trial court determined that the adoption petition could proceed without Father's consent.

{¶7} Father filed a notice of appeal from this judgment entry, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**APPELLANT WAS NOT PROPERLY SERVED WITH THE NOTICE OF ADOPTION.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED IN NOT APPLYING THE CONSENT REQUIREMENTS OF R.C. 3107.07(B).**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT'S DECISION THAT APPELLANT DID NOT MEET THE CONSENT REQUIREMENTS OF R.C. 3107.07(A) IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶8} For ease of discussion, we elect to address the first and second assignment of error together.

*First and Second Assignments of Error*

{¶9} In these assignments of error, Father argues that he was not served with proper notice of the Petition for Adoption of B.G.F. Specifically, Father contends that in the adoption petition Step-Father marked the two boxes pertaining to R.C. 3107.07(A), which governs when *a natural parent's* consent is not required to an adoption petition of a minor child. However, Father maintained that under Ohio Adoption Law he is considered *a putative father* and, therefore, R.C. 3107.07(B) applies, which sets forth a different evidentiary standard for whether Father's

consent is needed in order for the adoption to take place. The relevant portions of

R.C. 3107.07 at issue in this case state:

> **Consent to adoption is not required of any of the following:**
>
> **(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.**
>
> **(B) The putative father of a minor if either of the following applies:**
>
>> **(1) The putative father fails to register as the minor's putative father with the putative father registry established under section 3107.062 of the Revised Code not later than fifteen days after the minor's birth;**
>>
>> **(2) The court finds, after proper service of notice and hearing, that any of the following are the case:**
>>
>>> **(a) The putative father is not the father of the minor;**
>>>
>>> **(b) The putative father has willfully abandoned or failed to care for and support the minor;**
>>>
>>> **(c) The putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first.**

{¶10} The term "parent" is not defined in Chapter 3107 of the Revised Code, which governs adoption, however, according to R.C. 3107.01(H):

> **"Putative father" means a man * * * who may be a child's father and to whom all of the following apply:**
>
> > **(1)   He is not married to the child's mother at the time of the child's conception or birth;**
> >
> > **(2)   He has not adopted the child;**
> >
> > **(3)   He has not been determined, prior to the date a petition to adopt the child is filed, to have a parent and child relationship with the child by a court proceeding pursuant to sections 3111.01 to 3111.18 of the Revised Code, a court proceeding in another state, an administrative agency proceeding pursuant to sections 3111.38 to 3111.54 of the Revised Code, or an administrative agency proceeding in another state;**
> >
> > **(4)   He has not acknowledged paternity of the child pursuant to sections 3111.21 to 3111.35 of the Revised Code.**

{¶11} In support of his assertion that R.C. 3107.07(A) applies to this case, Step-Father filed with the adoption petition B.G.F.'s Indiana Certificate of Birth on which Father's name appears.  The Indiana Certificate of Birth also designates Father's last name as B.G.F.'s last name.  Father maintains that his name on the birth certificate alone is insufficient to conclusively demonstrate that he is B.G.F.'s natural parent under Ohio Adoption Law.  Consequently, Father maintains that for purposes of the notice and hearing pertaining to the adoption petition, he must be considered a putative father, which invokes R.C. 3107.07(B).  Therefore, Father

contends that he was not properly served notice of the adoption petition and further contends that the trial court erred by conducting the evidentiary hearing under the criteria set forth in R.C. 3107.07(A).

{¶12} To the contrary, Step-Father points to the presence of Father's name on the Indiana Certificate of Birth indicating that he is the natural father of B.G.F. and demonstrating that B.G.F. was given Father's last name at birth. Step-Father further relies on an Indiana statute that states:

**A child born out of wedlock shall be recorded:**

**(1)   under the name of the mother; or**

**(2)   as directed in a paternity affidavit executed under section 2.1 of this chapter.**

I.C. 16-37-2-13.

{¶13} Step-Father maintains that under the foregoing Indiana Statute, the placement of B.G.F. on the Indiana Certificate of Birth under Father's last name required, and could have only occurred where a valid affidavit of paternity has been executed by Mother and Father. Step-Father also directs us to testimony from Mother at the evidentiary hearing indicating that Father was at the hospital at the time of B.G.F.'s birth and that she executed her portion of a paternity affidavit stating that Father is B.G.F.'s natural father at that time. Step-Father's arguments on appeal and the relevant Indiana statutes suggest that the Indiana paternity

affidavit has a similar effect to an acknowledgement of paternity under Ohio law. [1]

*See* R.C. 3111.23 et seq. Thus, Step-Father contends that Father is B.G.F.'s natural

father for purposes of these adoption proceedings under Ohio Adoption Law.

{¶14} In resolving this issue, the trial court agreed with Step-Father and

found the Indiana statute cited above to be instructive. Specifically, the trial court

found that:

> **It is apparent to this court since [Father] is identified on the Indiana birth certificate as a parent of [B.G.F.] a paternity affidavit pursuant to Indiana Code 16-37-2-2.1 was executed. Otherwise his name will not appear on the birth certificate.**
>
> **Accordingly, the court finds that he is not a putative father but is a parent and, therefore, this action properly proceeded under R.C. 3107.07(A).**

(Doc. No. 19 at 4-5.)

*Discussion*

{¶15} At the outset, we note that R.C. 3705.09(F)(2), the Ohio statute which

governs the filing of a birth certificate, states:

> **If the mother was not married at the time of conception or birth or between conception and birth, the child shall be registered by the surname designated by the mother. The name of the father of such child shall also be inserted on the birth certificate if both the mother and the father sign an acknowledgement of paternity affidavit before the birth record has been sent to the local registrar. If the father is not named on the birth certificate**

---

[1] And perhaps could even be considered to constitute a finding of paternity in "an administrative proceeding in another state" under R.C. 3107.01(H)(3) which would specifically exclude Father from the definition of "putative father" under Ohio Adoption Law. This notwithstanding, we do not find it necessary to make or rely on any such finding in our resolution of this appeal.

**pursuant to division (F)(1) or (2) of this section, no other information about the father shall be entered on the record.**

{¶16} Moreover, in reviewing the pertinent Indiana statutory authority we recognize that a paternity affidavit executed in accordance with Indiana Code section 16-37-2-2.1 "conclusively establishes the man as the legal father of a child without any further proceedings by a court." I.C. 16-37-2-2.1 (p); *see*, *also*, IC 31-14-2-1 (stating that "[a] man's paternity may only be established: (1) in [a paternity] action under this article; or (2) by executing a paternity affidavit in accordance with IC 16-37-2-2.1); IC 31-14-7-3 (stating that "[a] man is a child's legal father if the man executed a paternity affidavit in accordance with IC 16-37-2-2.1 and the paternity affidavit has not been rescinded or set aside under IC 16-37-2-2.1). In addition, a paternity affidavit executed in accordance with IC 16-37-2-2.1 "(1) establishes paternity; (2) gives rise to parental rights and responsibilities of the person * * *, and (3) may be filed with a court by the department of child services." IC 16-37-2-2.1(j).

{¶17} Moreover, IC 16-37-2-2.1 provides a comprehensive list of specific contents that must be included in a valid paternity affidavit, such as a signed statement by *both* parents indicating that they understand that signing a paternity acknowledgment affidavit is voluntary; they understand their rights and responsibilities under the affidavit; the alternatives to signing the affidavit; and the consequences of signing the affidavit. *See* IC 16-37-2-2.1(e)(5). A valid paternity

affidavit must also contain the mother's sworn statement asserting that the "man who reasonably appears to be the child's biological father" is the child's biological father and a statement by a person identified as the father attesting to a belief that he is the child's biological father. *See* IC 16-37-2-2.1(g).

{¶18} Thus, under both Ohio and Indiana law, where an unmarried woman gives birth to a child, the father's name appears on the birth certificate *only* when he has voluntarily acknowledged paternity in writing. Furthermore, in Indiana, a man's execution of a paternity affidavit *conclusively* establishes that the man is the child's natural father, without any further judicial ratification through a court proceeding.

{¶19} Here, B.G.F.'s Indiana Certificate of Birth was provided to the trial court. And, as the trial court observed, the birth certificate identified Father as B.G.F.'s biological father. We concur with the trial court's rationale that because Indiana Law dictates that Father's name could not have appeared on the birth certificate unless he had voluntarily executed a valid paternity affidavit meeting the requirements of Indiana Law, the birth certificate together with Mother's testimony that such an affidavit was in circulation and was signed by her at the time of B.G.F.'s birth, is indeed substantial evidence of paternity. *See Pula v. Pula-Branch*, 8th Dist. Cuyahoga No. 93460, 2011-Ohio-4949 (according similar weight to the father's

name on the birth certificate to establish paternity in a child support action involving Ohio and Hawaii law).

**{¶20}** Therefore, we do not find persuasive Father's contention that he is considered to be a putative father under Ohio Adoption Law for purposes of these proceedings. Accordingly, we conclude that the trial court did not err when it found that Father had been properly served with notice of the adoption petition and that R.C. 3107.07(A) was the appropriate statute to apply to the adoption proceedings. Therefore, we overrule the first and second assignments of error on this basis.

*Third Assignment of Error*

**{¶21}** In his third assignment of error, Father challenges the trial court's conclusion that Step-Father proved by clear and convincing evidence that Father failed to provide more than *de minimis* contact with B.G.F. and failed to provide maintenance and support to B.G.F. as required by law or judicial decree for a period of at least one year immediately preceding the filing of the adoption petition under R.C. 3107.07(A). Specifically, Father maintains the trial court's conclusion that his consent to the adoption petition is not required is against the manifest weight of the evidence.

*Legal Standard*

**{¶22}** The right of natural parents to the care and custody of their children is one of the most precious and fundamental in law. *In re Adoption of Masa*, 23 Ohio

St.3d 163, 164 (1986) citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). An adoption permanently terminates the parental rights of a natural parent. *In re Adoption of Reams*, 52 Ohio App.3d 52, 55 (10th Dist.1989). Therefore, "[b]ecause adoption terminates these rights, Ohio law requires parental consent to an adoption unless a specific statutory exemption exists." *In re Adoption of A.N.B.*, 12th Dist. Preble No. CA2012-04-006, 2012-Ohio-3880, ¶ 5 citing *In re Caudill*, 4th Dist. Jackson No. 05CA4, 2005-Ohio-3927, ¶ 14.

{¶23} As previously discussed, the pertinent statutory provision in determining whether Father's consent to Step-Father's adoption petition is required is contained in R.C. 3107.07(A), which states.

> **Consent to adoption is not required of any of the following:**
>
> **(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.**

{¶24} R.C. 3107.07(A). "R.C. 3107.07(A) is written in the disjunctive." *In re Adoption of H.R.,* 3d Dist. Logan No. 8-14-15, ¶ 23. "Therefore, a failure without justifiable cause to provide *either* more than de minimis contact with the minor or maintenance and support for the one-year time period is sufficient to obviate the

need for a parent's consent. " (Emphasis sic.) *Id.*; *see also In re Adoption of A.H.*, 9th Dist. Lorain No. 12CA010312, 2013-Ohio-1600, ¶ 9.

{**¶25**} The Supreme Court of Ohio has articulated a two-step analysis for probate courts to employ when applying R.C. 3107.07(A). *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, ¶ 23. The first step involves the factual question of whether the petitioner has proven, by clear and convincing evidence, the natural parent failed to provide for the maintenance and support of the child or failed to have more than de minimis contact with the child. *Id.* Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "A trial court has discretion to make these determinations, and, in connection with the first step of the analysis, an appellate court applies an abuse-of-discretion standard when reviewing a probate court decision." *Id.* at ¶ 25. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).

**{¶26}** If a probate court makes a finding that the parent failed to support or contact the children, the court proceeds to the second step of the analysis and determines whether justifiable cause for the failure has been proven by clear and convincing evidence. *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236. The question of whether justifiable cause for the failure to contact the child has been proven in a particular case, "is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence." *Id.* "In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that there must be a reversal of the judgment and an order for a new trial." (Internal quotations omitted.) *In re Adoption of L.C.W.*, 12th Dist. Butler No. CA2014-08-169, 2015-Ohio-61, ¶ 14. In so doing, we must be mindful that the probate court is in the best position to observe the demeanor of the parties and assess the credibility and accuracy of the testimony.

*Evidence at the Hearing*

**{¶27}** The following evidence pertaining to the issue of whether Father's consent to Step-Father's Petition for Adoption of B.G.F. is not required under R.C. 3107.07(A) was adduced at the evidentiary hearing before the trial court. Step-

Father presented the testimony of his wife, B.G.F.'s Mother. Mother testified that she and Father lived together for several years prior to B.G.F.'s birth. However, during her pregnancy with B.G.F., Father was in a relationship with someone else. Mother explained that at the time of B.G.F.'s birth she lived with Father's mother in Indiana ("Paternal Grandmother"). Mother testified that Father had a history of being physically violent towards her. She recalled that in the Fall of 2018, approximately two weeks after B.G.F. was born, Father grabbed her by the throat while she was holding the car seat with B.G.F. in it. Specifically, she stated that "I still had stitches from my c-section. [Father] told me to bring him some tapioca pudding and I didn't do it. He was on his way out and he attacked me when I was holding my newborn son in a car seat and told me to shut that little bastard up before he killed him." (Tr. at 18). Two days later Mother moved to her parents' home in Shelby County, Ohio with B.G.F. Shortly after moving to Ohio, Mother began a relationship with Step-Father. Mother and Step-Father moved in together and lived next door to Mother's parents ("Maternal Grandparents").

*More Than De Minimis Contact*

{¶28} Mother testified that she had not seen Father since September 2015. At that time, Father asked to see B.G.F. and Mother facilitated Father's visitation with B.G.F. at Maternal Grandparents' house. Mother explained that she told Father he could see B.G.F. whenever he wanted provided that he visited B.G.F. at Maternal

Grandparents' house while under their supervision and that he did not take B.G.F. away from the home. Mother's testimony regarding this interaction with Father was corroborated by Maternal Grandparents who were both present at the time. Maternal Grandparents each testified that they offered for Father to come to their home so that he could regularly visit with B.G.F., which Father did on one occasion. Mother and Maternal Grandparents confirmed that Father never returned to exercise visitation with B.G.F.

{¶29} However, Mother remained in contact with Paternal Grandmother who regularly visited B.G.F. at Maternal Grandparents' home. Mother also stated that she also frequently facilitated video chats via FaceTime between Paternal Grandmother and B.G.F. Mother explained that the video chats were always completed by her calling Paternal Grandmother's phone. Mother recalled that one time Father entered the same room as Paternal Grandmother while she was video chatting with B.G.F. The video chatting session ended shortly thereafter.

{¶30} For his part, Father acknowledged that he had only seen B.G.F. two times since Mother left Indiana and claimed that he video chatted with B.G.F. less than twenty times between September 2015 and July 2017. He recalled that the video chats lasted from one to ten minutes. Father explained that the video chats took place on Paternal Grandmother's phone because Mother had blocked his phone number. Father claimed Mother secretly facilitated FaceTime chats between

himself and [B.G.F.] unbeknownst to Step-Father because Step-Father did not like Father. He recalled that during these conversations if Step-Father came home Mother would disconnect the video chat or ask Paternal Grandmother to call her back and speak to B.G.F. without the video component. Father also claimed that two weeks before Mother married Step-Father in September of 2017, within the relevant one-year statutory period, Mother allowed B.G.F. to Facetime with him and B.G.F. called him "Daddy." Father also claimed that Mother sent him voice recordings of B.G.F. calling him "Daddy," but Father did not bring the recordings to court as evidence for the hearing.

{¶31} To the contrary, Mother denied that she facilitated video chat interactions specifically between Father and B.G.F., and claimed that the arrangements were exclusively made so that Paternal Grandmother could maintain contact with B.G.F. Mother further testified that Father had not attempted to participate in the FaceTime chats or attempted to otherwise see B.G.F. within the relevant one-year statutory time period prior to the filing of the adoption petition in October of 2017. Paternal Grandmother also provided testimony about these interactions on FaceTime. She estimated that since October 2016 she had five or six FaceTime conversations with B.G.F. and stated that the majority of the time the chats were arranged between Mother and herself, and that some of the time Father just happened to be present. (Tr. at 134).

{¶32} Father did not dispute that he had been physically abusive toward Mother in the past. Father also acknowledged that Maternal Grandparents had offered to facilitate supervised visitations between him and B.G.F. in their home, but he claimed that he felt "real uncomfortable" being at the home because he knew that Maternal Grandmother did not like him. (Tr. at 91). Father also stated that he did not like the conditions Mother put on his visitations with B.G.F. With regards to seeking visitations, Father admitted that "I guess it's true that I didn't make an effort. I tried to renegotiate that, that was my effort." (Tr. at 95). Father further admitted that he had not filed a custody action to enforce his parental rights in court.

*Maintenance and Support*

{¶33} With regard to support, Mother stated that even though Father was at the hospital at the time of B.G.F.'s birth, Father did not contribute to the medical expenses related to the birth. Rather, those expenses were paid by Medicaid. Mother further stated that there was never a child support or custody order in place. However, Mother testified that other than two small toys that Father sent with Paternal Grandmother when she visited B.G.F. during his first year, Father had not paid for clothing or diapers for B.G.F., and had never sent a birthday or Christmas card to B.G.F. On the other hand, Mother explained that Paternal Grandmother had given B.G.F. several gifts and had given Mother money for B.G.F. Specifically, Mother recalled that in the year preceding the filing of the adoption petition Paternal

Grandmother gave B.G.F. a swing set and two cashier's checks in the amount of $50.00 each for his birthday. Mother stated that the gifts were always clearly from Paternal Grandmother and not from Father. For instance, Mother testified that the order form with the swing set given to B.G.F. indicated that Paternal Grandmother was the purchaser.

{¶34} Father maintained that he paid for the majority of the gifts and money given to B.G.F. when Paternal Mother visited him. For instance, Father claimed that he paid for eighty percent of the swing set given to B.G.F. in the Summer of 2016 and that he purchased the two fifty dollar cashier checks for B.G.F.'s birthday in 2016. Father claimed he did not attempt to make Mother aware that the gifts were from him because he knew that Step-Father did not like him and was afraid it would jeopardize Paternal Grandmother's access to B.G.F. A copy of the cashier's checks were presented as evidence at trial. The exhibit indicated that the checks were issued in August of 2016 and cashed in November of 2016. Despite Mother's testimony that the checks were from Paternal Grandmother's bank, Father's name appeared on the checks as the remitter. Paternal Grandmother provided testimony supporting Father's stance that he paid for most of the gifts she brought to B.G.F. when she visited him.

*Trial Court's Ruling*

**{¶35}** The trial court made the following findings in its judgment entry concluding that Father's consent to the adoption petition is not required under R.C. 3107.07(A). Specifically, with regard to Father's lack of contact the trial court found that:

> **In this case, [Father] concedes that he has had very little communication or contact with [B.G.F.]. He has not seen [B.G.F.] in person since 2015. According to his testimony, he may have had some contact five or six times in the year before the filing of the adoption petition through FaceTime. [Father] claims that he and [Mother] arranged FaceTime conversation for him to communicate with [B.G.F.]. The other evidence does not support [Father's] contention. His testimony suggests that contact was less than a minute to five minutes each. However, his claims of communication and contact are not credible. His testimony is discredited by his own witness, his mother, who indicated that when she was FaceTiming with [Mother] that [Father] may have been in the background and any communication or contact would have been minimal at best. It was the grandmother that was seeking contact with [B.G.F.], not the Father. Mother even denies that minimal contact.**
>
> **This court also finds that there was no justification for the failure to communicate. The evidence demonstrated that offers were made for [Father] to visit or see the child and he failed to do so. There was little or no evidence to suggest that [Father] was prevented from communicating with [B.G.F.].**

(Doc. No. 20 at 6).

**{¶36}** With regard to Father's failure to support, the trial court noted it is well established in Ohio Adoption Law that "[d]e minimis monetary gifts from a biological parent to a minor child do not constitute maintenance and support,

-21-

because they are not payments as required by law or judicial decree as R.C. 3107.07(A) requires." *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, at ¶ 20. The trial court found that:

> **In this case, the evidence is that except for two $50.00 checks no monetary support was provided for [B.G.F.] and, those two checks were issued more than one year before the filing of the adoption petition. Even if considered within the one year period those two checks hardly constitute maintenance or support. Even if, as now claimed, that [Father] provided funds for purchasing gifts given to [B.G.F.] by the grandmother those gifts were insufficient to be considered as maintenance and support.**

(Doc. No. 20 at 7).

{¶37} On appeal, Father claims that the video chats he engaged in with B.G.F., of which the evidence indicates were merely five or six within the relevant statutory time period, were enough to satisfy the more than *de minimis* requirement under R.C. 3107.07(A). In the alternative, Father contends that he had reasonable justification for failing to have more than *de minimis* contact with B.G.F. due to Mother placing an unreasonable barrier to him visiting with B.G.F.

{¶38} In addressing Father's contention that his video chats with B.G.F. constituted more than *de minimis* contact for the purposes of the statute, we note that there was conflicting testimony as to the nature and frequency of these alleged video chats between Father and B.G.F. within the one-year statutory timeframe. While the record reveals that Father maintained that Mother secretly facilitated direct communication between he and B.G.F., other testimony indicated that the

video chats were arranged solely so that Paternal Grandmother could have contact with B.G.F. and Father happened to be present on occasion. As previously, stated, we defer to the probate court in determining factual disputes on this matter. *See In re Adoption of A.M.L.*, 12th Dist. Warren No. CA2015-01-004, 2015-Ohio-2224, ¶ 11.

**{¶39}** We also note that the record does not support Father's contention that Mother substantially interfered with his ability to communicate with B.G.F. By his own admission, Father acknowledged that Mother attempted to facilitate Father's visitation with B.G.F., albeit under certain conditions—i.e. at her parents' home, who lived next door, and under their supervision. Mother further clarified at the hearing that she did not want Father or Paternal Grandmother to take B.G.F. from the home until B.G.F. was old enough to communicate with her and tell her what took place during the visits.

**{¶40}** These initial conditions do not appear to be unreasonable given the uncontroverted testimony in the record regarding the physical violence between Mother and Father when they lived at Paternal Grandmother's home in Indiana. Moreover, despite the acrimonious history between Father and Mother in the past, Maternal Grandparents, who resided next door to Mother and B.G.F., remained willing to host Father at his convenience so that he could build a relationship with B.G.F., which Father chose not to do. Notably, the record indicates that Paternal

Grandmother frequently visited with B.G.F. in Ohio and stayed overnight at Maternal Grandparents during several of these visits. *See In re Adoption of J.F.R.-W.*, 7th Dist. Belmont No. 16 BE 0045, 2017-Ohio-1265, ¶ 44-45 (stating non-custodial parent's knowledge of residence of child weighs heavily against finding custodial parent prevented contact).

**{¶41}** As for the issue of maintenance and support, the trial court's conclusion that Father only provided two fifty dollar checks to Mother for gifts to B.G.F. was supported by the record. As previously discussed, "[d]e minimis monetary gifts from a biological parent to a minor child do not constitute maintenance and support, because they are not payments as required by law or judicial decree as R.C. 3107.07(A) requires." *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, at ¶ 20. Again, even though father claimed that he paid for the majority of the gifts given to B.G.F. by Paternal Grandmother, the trial court was free to believe Mother's testimony that the gifts were in fact from Paternal Grandmother. "A probate judge has discretion to determine whether the biological parent provided support as contemplated by R.C. 3107.07(A) 'and his or her judgment should not be tampered with absent an abuse of discretion.' " *In re Adoption of M.B.* at ¶ 21, citing *In re Adoption of Bovett*, 33 Ohio St.3d at 107; *see also In re Adoption of Charles B.*, 50 Ohio St.3d 88 (1990), paragraph three of the

syllabus ("adoption matters must be decided on a case-by-case basis through the able exercise of discretion by the trial court").

{¶42} The record clearly indicates that the trial court chose not to believe Father's testimony. As noted above, the trial court is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony. *In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985). From the testimony and the evidence presented, we find no abuse of discretion in the trial court's conclusion that Step-Father proved by clear and convincing evidence that Father had failed without justifiable cause to provide more than *de minimis* contact with B.G.F or to provide for the maintenance and support of B.G.F. as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition. Accordingly, the third assignment of error is overruled.

{¶43} For all these reasons, the assignments of error are overruled and judgment of the trial court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**